822 F.2d 1508
 Lenord S. HORWITZ, D.P.M., Plaintiff-Appellant,
v.
The STATE BOARD OF MEDICAL EXAMINERS OF the STATE OF
COLORADO; Robert L. Lederer, M.D.; Jack Klapper, M.D.;
Ray Piper, D.O.; Henry Feiger, M.D.; Fred Pacquette, M.D.;
Christine Peterson, M.D.; John Carroll; Nelson Mohler,
D.O.; Stephen Kozloff, M.D.; Bruce Wilson; Michael Vitek,
M.D., Defendants-Appellees.
 No. 85-2448.
 United States Court of Appeals,
Tenth Circuit.
 July 7, 1987.
 
 Richard S. Strauss (Jordan Hochstadt, with him on the briefs), of Hochstadt, Straw & Strauss, P.C., Denver, Colo., for plaintiff-appellant.
 F. Michael Ludwig (David B. Perry, with him on the brief), of Wood, Ris & Hames, P.C., Denver, Colo., for defendants-appellees.
 Before LOGAN, BARRETT and ANDERSON, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 The issue presented on this appeal is whether members of the Colorado State Board of Medical Examiners, sued individually for damages for alleged deprivation of plaintiff-appellant's civil rights, are entitled to absolute immunity or qualified immunity. The district court, in granting defendants-appellees' motion for summary judgment, ruled that because the defendants performed functions comparable to those of a court of law when they ordered the suspension of plaintiff's license to practice medicine in Colorado, they were entitled to absolute immunity. We agree.
 
 Background
 
 2
 Plaintiff-appellant, Lenord D. Horwitz, D.P.M., hereinafter referred to either as plaintiff or Dr. Horwitz, was licensed to practice podiatry in Colorado in 1964.
 
 
 3
 During the period 1970-1983, some sixteen charges of unprofessional conduct were filed against Dr. Horwitz with the State Board of Medical Examiners of the State of Colorado (the Board), which is the state body empowered to license physicians and to take disciplinary action against them. Fifteen of the sixteen charges had been initiated by the Board. Prior to July 15, 1983, after two evidentiary hearings involving fourteen of the charges, the hearing panel of the Board found that Dr. Horwitz had not violated any provision of the Podiatry Act, C.R.S. 12-32-107, as amended. On July 15, 1983, Dr. Horwitz and the Board entered into a Stipulation whereby the Board agreed to dismiss with prejudice the two remaining charges of unprofessional conduct lodged against Dr. Horwitz in consideration of Dr. Horwitz's agreement to allow his surgical practice to be supervised by an ambulatory foot surgeon and his record keeping practice to be supervised by a podiatrist. One Dr. Stephen Albert was appointed by the Board to serve as supervisor for both record keeping and surgery.
 
 
 4
 Dr. Albert submitted reports to the Board prior to December 1, 1983, indicating that certain records kept by Dr. Horwitz had been deficient, but that Dr. Horwitz had undertaken corrective measures. Dr. Albert did not submit any negative reports relative to Dr. Horwitz's surgical practice. Also, on the same day, Dr. Albert and Dr. Horwitz met with the hearing panel of the Board relative to why Dr. Albert had supervised only a limited number of Dr. Horwitz's surgical practices. During the course of this meeting, out of the presence of Dr. Horwitz, Dr. Albert expressed concern about the quality of Dr. Horwitz's surgical practice, and stated his belief that Dr. Horwitz was a danger to the public. The inquiry panel thereafter met with Dr. Horwitz and his attorney relative to reasons why the number of surgical supervisions set forth in the Stipulation had not occurred. No reference was made to Dr. Albert's complaints about Dr. Horwitz's surgical practice. Following Dr. Horwitz's departure from the meeting, the hearing panel voted to summarily suspend Dr. Horwitz's license to practice podiatry in Colorado and instructed the office of the Attorney General to prepare a formal complaint.
 
 
 5
 The Board's order of December 21, 1983, was based both on oral and written reports submitted by Dr. Albert to the Board and it contained a finding required under C.R.S. Sec. 24-4-104(4) that the Board had reasonable grounds to believe that Dr. Horwitz's practice of podiatry constituted a threat to his present and future patients, and therefore to the public health, safety and welfare such as to imperatively require emergency action. On that same day, the Board filed its formal complaint and on January 4, 1984, Dr. Horwitz was served with the Order of Summary Suspension and Formal Complaint. Dr. Horwitz submitted his written response on January 5, 1984, but continued to practice podiatry until restrained from doing so by order of the District Court for the City and County of Denver on January 9, 1984. Within fifteen days of Dr. Horwitz's response and within ten days of the issuance of the temporary restraining order, a full evidentiary hearing before a qualified hearing officer was held. Dr. Horwitz was represented by counsel and was afforded full opportunity to present evidence, express his positions and to fully cross-examine all witnesses.
 
 
 6
 On February 6, 1984, the hearing officer rendered his decision. He found in Dr. Horwitz's favor on forty-two (42) of the forty-four (44) allegations and also found against him on two charges, which he identified as relatively minor. The hearing officer recommended that Dr. Horwitz's license to practice podiatry be immediately reinstated, subject to his completion of the supervision previously agreed upon. Thereafter, the hearing panel and the inquiry panel of the Board denied Dr. Horwitz's application for reinstatement, and on May 1, 1984, the hearing panel, following review of the hearing transcript, entered its Final Order which in part affirmed the hearing officer's decision, in part modified the decision and in part included independent findings. The Order placed Dr. Horwitz on a one-year probation, subject to supervision. It also imposed certain requirements.
 
 Litigation
 
 7
 Dr. Horwitz filed this action pursuant to 42 U.S.C. Secs. 1983 and 1988 against the State Board of Medical Examiners and its then current members. He sought compensatory and punitive damages, together with attorney's fees, alleging that he had been subjected to unfounded complaints, summarily suspended from the practice of podiatry in violation of his Fourteenth Amendment due process rights, and defamed and subjected to outrageous conduct. The Board was dismissed from the suit by virtue of the State's claim of sovereign immunity invoked pursuant to the Eleventh Amendment. That ruling is not challenged on appeal.
 
 
 8
 Prior to filing the instant action, Dr. Horwitz appealed the Board's Final Order to the Colorado Court of Appeals, seeking review of the action summarily suspending his license. The due process contentions advanced here were presented there. The court rejected the due process contentions and bad faith allegations. The court affirmed the Board's order except for the probationary requirement that Dr. Horwitz complete courses in anesthetics and aseptics. Dr. Horwitz filed a petition for rehearing and after its denial he filed a petition for writ of certiorari with the Colorado Supreme Court. This, too, was denied.
 
 Functions of the Board
 
 9
 The Board is a statutory body whose eleven members are appointed by the governor. C.R.S. Sec. 12-36-103(1). Its powers, duties and functions are set forth in the Colorado Medical Practices Act, C.R.S. Sec. 12-36-101, et seq. (1973 as amended) and the Colorado Administrative Procedure Act, C.R.S. Sec. 24-4-101, et seq. (1973 as amended).
 
 
 10
 Broad judicial and prosecutorial powers of the Board are set forth in C.R.S. Sec. 12-36-104, while Board procedures required for disciplinary proceedings are set forth in C.R.S. Sec. 12-36-118. The Board consists of a president and ten members, two of whom are from the public at large, nine of whom are licensed physicians. The president divides the members into two panels for disciplinary action, each panel consisting of at least four physician members. Each panel serves as both an inquiry panel and a hearing panel. When a written complaint is received, the inquiry panel undertakes an investigation into the charges in order to determine whether there are sufficient grounds for a hearing. The Board is empowered to investigate all complaints and to initiate them. If further proceedings are warranted, the matter is referred to the hearing panel which may conduct an evidentiary hearing or refer the matter to an appointed hearing officer for an evidentiary hearing, subject to the hearing panel's review. The individual against whom a complaint is filed must be informed of the charges and provided an opportunity to respond and appear in his own defense with counsel. When the hearing panel submits its report or order with findings and conclusions, it becomes the order of the Board.
 
 
 11
 C.R.S. Sec. 24-4-104(4) empowers the Board to summarily suspend a license to practice medicine when the Board has reasonable grounds to believe that the public health, safety, or welfare is endangered and the board finds that emergency action is required. In Colorado State Board of Medical Examiners v. District Court, 191 Colo. 158, 551 P.2d 194 (1976), the Colorado Supreme Court upheld this statute against due process contentions similar to those advanced here. The Colorado Court of Appeals, on review of the Order of the Board entered in the instant case, specifically upheld the Board's action summarily suspending Dr. Horwitz's license to practice medicine under Colorado State Board, supra. Further, the court found that the record supported the Board's determination that there were reasonable grounds to believe that emergency action was required.
 
 District Court Order
 
 12
 In granting the defendants' motion for summary judgment, the federal district court found that none of the disputed facts were relevant to the legal issues raised by defendants on the immunity issue and ruled that:
 
 
 13
 The Board's powers are "functionally comparable" to that of a court of law. The risk of an unconstitutional act by individuals on the Board is clearly outweighed by the importance of attracting qualified individuals to serve with such agencies and of preserving their independent judgment. "Those who complain of error in such proceeding must seek agency or judicial review." Butz v. Economou, 438 U.S. at 509, 514, 98 S.Ct. at 2915.
 
 
 14
 R., Vol. II, Exh. 7.
 
 
 15
 The district court also found that the Board and its members were "plainly acting within the scope of their authority when they ordered the plaintiff's suspension." Id.
 
 Contentions on Appeal
 
 16
 On appeal, Dr. Horwitz argues that the district court erred in granting summary judgment in favor of the defendant Board members because: (1) as a matter of law, the Board members have not established that they are entitled to an absolute or qualified immunity, (2) whatever immunity may attach to the Board members does not apply in this case inasmuch as they did not (except for one Dr. Fieger) subscribe an oath of office as required by law, (3) there is no absolute immunity for members of the Inquiry Panel inasmuch as C.R.S. Sec. 12-36-103(5) grants only a good faith immunity involving disciplinary proceedings or other official acts, and (4) the law was well established at all times pertinent to this case that Dr. Horwitz had a valuable property interest in his license to practice and that it could not be taken from him without due process of law which was not provided in this case.
 
 
 17
 Before addressing the above contentions, we observe that on appeal the defendants-appellees argue, for the first time, that Dr. Horwitz's claims are barred on appeal by the full faith and credit clause of the Constitution, 28 U.S.C. Sec. 1738. This argument is based on the contention that Dr. Horwitz is precluded from raising claims before this court that were or could have been raised in the action before the Colorado Court of Appeals.
 
 
 18
 As a general rule, we will not review matters raised for the first time on appeal. K-B Trucking Co. v. Riss Intern. Corp., 763 F.2d 1148 (10th Cir.1985). This rule does not apply to defenses going to our jurisdiction, however. They may be raised for the first time on appeal. Garcia v. Bd. of Ed. of Socorro Consolo. School Dist., 777 F.2d 1403 (10th Cir.1985), cert. denied, --- U.S. ----, 107 S.Ct. 66, 93 L.Ed.2d 24 (1986). Res judicata rules and principles must be raised as affirmative defenses. They are waived if not raised as affirmative defenses in the trial court and cannot be raised for the first time on appeal, Nevada Power Co. v. Watt, 711 F.2d 913, 932-933 (10th Cir.1983), unless peculiar facts and the interests of judicial economy dictate otherwise. Lujan v. United States Dept. of the Interior, 673 F.2d 1165, 1168 (10th Cir.), cert. denied, 459 U.S. 969, 103 S.Ct. 297, 74 L.Ed.2d 279 (1982).
 
 
 19
 Here, the opinion of the Colorado Court of Appeals was rendered on June 27, 1985, more than two months before the federal district court granted the summary judgment in the case at bar. Even so, there is nothing in the record before us indicating that the defendants-appellees brought the matter to the attention of the federal district court. In addition, we have reviewed the record on appeal and do not find therein an authenticated copy of the judgment of the Colorado Court of Appeals required under 28 U.S.C. Sec. 1738 in order to have full faith and credit effect. Thus, under the circumstances, we do not believe that the defendants-appellees have presented peculiar facts or demonstrated reasons why the interests of judicial economy dictate that this court consider their res judicata issue for the first time.
 
 I.
 
 20
 Dr. Horwitz contends that the district court committed clear error in finding and ruling that the defendants enjoy absolute immunity from suit for the official activities they exercised in his case. Instead, he contends that if the Board members are entitled to any immunity, it can be no greater than the "good faith" immunity defined in the statute limiting their liability. C.R.S. Sec. 12-36-103. He further argues that the district court erred in finding and ruling that the defendants were entitled to summary judgment, even accepting the proposition that defendants have only a qualified immunity.
 
 
 21
 The district court reasoned that when the defendants summarily suspended Dr. Horwitz's license and refused to reinstate it until May 1, 1984, they did not violate a clearly established constitutional right of due process. Dr. Horwitz contends that the law was well established, and that the defendants must have known or be charged with knowledge of the due process requirements of notice and hearing to which he was constitutionally entitled.
 
 
 22
 Absolute immunity, which affords complete protection from liability for damages, defeats suit at the outset. On the other hand, "qualified immunity" is an affirmative defense to be asserted by a government official performing discretionary functions. It is premised on the contention that the challenged conduct was undertaken in good faith or did not violate clearly established law or constitutional rights that a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
 
 
 23
 The parties agree that Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) is a seminal case on the issue of immunity. As may be expected, the parties disagree on its import to the case at bar. Dr. Horwitz contends that when the Butz court denied Butz absolute immunity because he was not acting the equivalent of a judge or prosecutor, the same reasoning applies to the Board members. The significant holding in Butz, argues Dr. Horwitz, was the denial of absolute immunity to Secretary Butz while acting in his official capacity of reviewing the decision of an administrative law judge. Dr. Horwitz likens the Board members' review of the hearing officer's decision in the instant case to Butz's review. The Board members, on the other hand, point out that all of the steps from the summary suspension through the final decision of the hearing panel constituted the adjudicative scheme found in Butz to confer absolute immunity on executive-agency officials. We agree. The Butz decision granted absolute immunity to administrative officials performing functions analogous to those of judges and prosecutors if the following formula is satisfied: (a) the officials' functions must be similar to those involved in the judicial process, (b) the officials' actions must be likely to result in damages lawsuits by disappointed parties, and (c) there must exist sufficient safeguards in the regulatory framework to control unconstitutional conduct. That formula is satisfied in the case at bar.
 
 
 24
 In Pierson v. Ray, 386 U.S. 547, 553, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967), the Supreme Court recognized that judges, performing acts within their judicial jurisdiction, are absolutely immune from damages in civil actions. In Imbler v. Pachtmann, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Court held that prosecutors are quasi-judicial officers when their official duties involve them in the judicial phase of initiating and prosecuting a criminal proceeding. Absolute immunity from liability for damages has also been held to apply to legislators while acting in their legislative capacities, Eastland v. United States Servicemen's Fund, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975), to the President, Nixon v. Fitzgerald, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), to parole officers while making parole decisions, Martinez v. California, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), and to legislative aides acting in their legislative capacities. Gravel v. United States, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 584 (1972). Judicial immunity from damages is not a bar to injunctive relief against a judge for actions taken in his or her official judicial capacity. Pulliam v. Allen, 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984).
 
 
 25
 Butz v. Economou did extend the doctrine of absolute immunity to executive officials, such as the Board members here, while engaging in judicial acts. Later, in Cleavinger v. Saxner, 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), the Court held that absolute immunity from damages applies to federal hearing examiners and administrative law judges. Dr. Horwitz would confine the absolute immunity doctrine, per his interpretation of Butz, to the hearing officer only. We disagree.
 
 
 26
 Butz v. Economou involved an action for damages against the Secretary and other executive officials of the Department of Agriculture following the Department's unsuccessful attempt to revoke the registration of a commodity futures commission company. Various constitutional rights violations were charged. The federal district court held that the Secretary, the assistant Secretary, the Judicial officer, the Chief Hearing Examiner and counsel for the Department who prosecuted during the proceeding were absolutely immune. The Court of Appeals reversed, holding that the defendant officials were entitled only to a qualified or "good faith" immunity. The Supreme Court majority reversed, holding that while qualified immunity from liability for damages is the general rule applicable to executive department officials, there are certain functions performed by such officials that require complete, absolute immunity.
 
 
 27
 The Court held that such officials who perform adjudicatory functions within the federal agency, who must decide to initiate or pursue a proceeding subject to agency adjudication, and agency personnel who present evidence in such proceedings, are entitled to absolute immunity. Thus, the Court looked to the officials' duties and functions. It likened adjudicatory functions within agencies to judicial functions, prosecutorial functions such as initiating, arranging and presenting evidence to prosecutorial functions and presenting evidence as witness functions. The Court held that these functions were clearly within the limits of statutory duties which the Department officials were charged to perform, thus affording them absolute immunity from damages. The Court recognized that "the extension of absolute immunity from damages liability to all federal executive officials would seriously erode the protection provided by basic constitutional guaranties," Id. at 505, and that "[a]ll individuals, whatever their position in government, are subject to federal law." Id. at 506. Nevertheless, the Court held that "[i]n a suit for damages arising from unconstitutional action, federal executive officials exercising discretion are entitled only to ... qualified immunity ... subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business." (Footnote omitted). Id. at 507.
 
 
 28
 The "exceptional situations" identified in Butz were situations arising when executive department officials, such as the Board members in the case at bar, functionally serve in capacities comparable to judges, prosecutors and jurors. As such, they serve as "quasi-judicial" officers and are absolutely immune from private suits for damages. The Court explained:
 
 
 29
 We think that adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages. The conflicts which federal hearing examiners seek to resolve are every bit as fractious as those which come to court.... Moreover, federal administrative law requires that agency adjudication contain many of the same safeguards as are available in the judicial process. The proceedings are adversary in nature.... They are conducted by a trier of fact insulated from political influence.... A party is entitled to present his case by oral or documentary evidence, ... and the transcript of testimony and exhibits together with the pleadings constitute the exclusive record for decision.... The parties are entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record.
 
 
 30
 Id. at 513.
 
 
 31
 The Butz court then likened the tasks of the federal hearing examiner or administrative law judge as "functionally comparable" to that of a judge, and observed:
 
 
 32
 In light of these safeguards, we think that the risks of an unconstitutional act by one presiding at an agency hearing is clearly outweighed by the importance of preserving the independent judgment of these men and women. We therefore hold that persons subject to these restraints and performing adjudicatory functions within a federal agency are entitled to absolute immunity from damages liability for their judicial acts. Those who complain of error in such proceedings must seek agency or judicial review.
 
 
 33
 Id. at 514.
 
 
 34
 The Court also held that agency officials performing certain functions analogous to those of a prosecutor, including decisions to initiate administrative proceedings against an individual or corporation and to seek certain sanctions, are entitled to absolute immunity. Id. at 515. The Butz court further held that an agency attorney who presents evidence and conducts the administrative trial serves the same function as a prosecutor and is therefore entitled to absolute immunity. In conclusion, the Court stated:
 
 
 35
 We believe that agency officials must make the decision to move forward with an administrative proceeding free from intimidation or harassment. Because the legal remedies already available to the defendant in such a proceedings provide sufficient checks on agency zeal, we hold that those officials who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision.
 
 
 36
 Id. at 516.
 
 
 37
 This court has recognized and applied the Butz rationale in cases involving state administrative/executive officials serving in adjudicative, judicial, or prosecutorial capacities. Lentsch v. Marshall, 741 F.2d 301 (10th Cir.1984); Wilhelm v. Continental Title Co., 720 F.2d 1173 (10th Cir.1983), cert. denied 465 U.S. 1103, 104 S.Ct. 1601, 80 L.Ed.2d 131 (1984); and Johnston v. Herschler, 669 F.2d 617 (10th Cir.1982). The Butz court deemed "[i]t untenable to draw a distinction for purposes of immunity law between suits brought against state officials under Sec. 1983 and suits brought directly under the constitution against federal officials." 438 U.S. at 504, 98 S.Ct. at 2909.
 
 
 38
 We conclude that under the Butz court rationale, the defendant Board members, who performed statutory functions both adjudicatory and prosecutorial in nature, are entitled to absolute immunity from damages liability under 42 U.S.C. Sec. 1983. There exists a strong need to insure that individual Board members perform their functions for the public good without harassment or intimidation. There exist adequate due process safeguards under Colorado law to protect against unconstitutional conduct without reliance upon private damages lawsuits. It is important to insulate Board members from political influences in meeting their adjudicatory responsibilities in the adversarial setting involving licensure to practice medicine. Public policy requires that officials serving in such capacities be exempt from personal liability.
 
 
 39
 In the evaluation of the Board members' functions, we observe that they serve in the prosecutorial role in that they, among other things, initiate complaints, start hearings, make investigations, take evidence, and issue subpoenas. They also serve in the adjudicative role, as judges. Thus, the Board duties are "functionally comparable" to a court of law. And we are reminded that, with respect to immunity, we must include all acts of the official performing statutory duties as having "[m]ore or less connection with the general matters committed by law" to his station. Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896). See Simons v. Bellinger, 643 F.2d 774 (D.C.Cir.1980) (holding that members of the D.C. Committee on Unauthorized Practice of Law perform duties functionally comparable to duties performed by judges and prosecutors, thus entitling them to absolute immunity from damages liability); Mayes v. Horn, 542 F.2d 822, 824 (10th Cir.1976) (recognizing the quasi-judicial immunity enjoyed by a state Board of Law Examiners); Ginger v. Circuit Court for County of Wayne, 372 F.2d 621 (6th Cir.), cert. denied, 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 998 (1967) (holding that state judges and members of the grievance committee of State Bar of Michigan while acting in their statutory powers in a disbarment proceeding were absolutely immune from a damages liability in a 42 U.S.C. Sec. 1983 action); Verner v. State of Colorado 533 F.Supp. 1109 (D.Colo.1982), affirmed, 716 F.2d 1352 (10th Cir.1983), cert. denied, 466 U.S. 960, 104 S.Ct. 2175, 80 L.Ed.2d 558 (1981) (holding a 42 U.S.C. Sec. 1983 damage claim against members of two state boards dealing with practice of law barred by doctrine of quasi-judicial immunity).
 
 
 40
 The district court, for purposes of its order granting the defendants' motion for summary judgment, accepted the allegations of Dr. Horwitz's complaint as true and found, as a matter of law, that the Board members were entitled to summary judgment on the immunity issue. We agree. The district court properly relied on Butz v. Economou, in concluding, as a matter of law, that the Board members exercised adjudicative functions comparable to those exercised by a court of law. The district court gave careful consideration to the delicate balancing problems involved in this case. In Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) the Supreme Court recognized that the doctrine of immunity, absolute or qualified, to be extended to public officials, is one of judicial making, involving the delicate balancing of the rights of citizens to obtain damages relief for wrongs committed by public officials and the need to assure that public officials will perform their duties unfettered by the concern that their actions may subject them to costs of defense and the possibility of a damage award against them. The nature of the particular duty performed by a public official determines the reach and applicability of the immunity doctrine. Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); Clulow v. State of Oklahoma, 700 F.2d 1291 (10th Cir.1983) (holding that Oklahoma Bar Association officials charged with statutory duties involving attorney disciplinary cases enjoy absolute immunity); G.M. Leasing Corp. v. United States, 560 F.2d 1011 (10th Cir.1977), cert. denied, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516 (1978).
 
 II.
 
 41
 Dr. Horwitz argues that whatever immunity may otherwise attach in this case does not apply because the Board members (except for Dr. Fieger) did not subscribe an oath of office as required by law. The district court ruled that, even assuming the truth of this contention, still the individual defendants were at least de facto public officials. The court relied on Butler v. Phillips, 38 Colo. 378, 381, 88 P. 480 (1906). We agree.
 
 
 42
 Butler v. Phillips involved a challenge to the jurisdiction of a county court and the right of the county court judge to act. The Supreme Court rejected the challenge, holding that although the statute creating the judgeship was unconstitutional, still the county judge elected thereunder was an officer de facto whose judgeship acts were therefore valid. The Court quoted from State v. Carroll 38 Conn. 449, 9 Am.Rep. 409, in defining the de facto officer doctrine:
 
 
 43
 An officer de facto is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons, where the duties of the office were exercised: ... under the color of a known and valid appointment or election, but where the officer has failed to conform to some precedent requirement or condition, as to take an oath....
 
 
 44
 88 P. at 481.
 
 
 45
 The challenge must also fail under the "de facto officer doctrine." That doctrine distinguishes between collateral attacks wherein a plaintiff challenges government action on the ground that the official who took the action was improperly in office, such as here, and direct attacks wherein the plaintiff challenges the qualifications of the officer, rather than the actions taken. The doctrine holds that collateral attacks pose too great a threat that past actions of the challenged official would be subjected to wholesale invalidation and thus interfere with orderly government. Andrade v. Lauer, 729 F.2d 1475 (D.C.Cir.1984).
 
 III.
 
 46
 Dr. Horwitz contends that there can be no absolute immunity for the Board members inasmuch as the enabling statute creating the Board provides under C.R.S. Sec. 12-36-103(5) that Board members:
 
 
 47
 "[s]hall be immune from suit in any action, civil or criminal, based upon any disciplinary proceedings or other official acts performed in good faith as members of such board." (emphasis supplied)
 
 
 48
 Dr. Horwitz's challenge ignores the fact that the immunity claimed by the Board members here is based on common law immunity, supra, rather than on any statutory grant. Throughout this action, the defendant Board members have argued that they are entitled to the common law absolute immunity historically afforded judges, prosecutors and other officials involved in the judicial process because as they function in adjudicatory and prosecutorial capacities during disciplinary proceedings.
 
 
 49
 The district court did not err in applying the traditional common law immunity doctrine.IV.
 
 
 50
 Finally, Dr. Horwitz argues that summary judgment was not appropriate because there is no question that his due process rights were violated. He states that in December, 1983, and thereafter, the law was well established that his property interest in his license was important enough that it could not be taken from him without providing him due process of law. Dr. Horwitz relies on cases such as Berry v. Barchi, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), and Keney v. Derbyshire, 718 F.2d 352 (10th Cir.1983). He contends that his due process rights were violated here because he was not provided with any notice or pre-suspension procedures prior to the summary suspension of his license on December 21, 1983, nor was the matter promptly determined and acted upon thereafter.
 
 
 51
 The district court found that when Dr. Horwitz' license was summarily suspended on December 21, 1983, and not reinstated until May 1, 1984, no clearly established constitutional rights of which a reasonable person would have known were violated. The court pointed to Colorado State Board of Medical Examiners v. District Court, supra, as the only court decision addressing the constitutionality of C.R.S. Sec. 24-4-104(4), and found that that decision expressly holds that summary suspensions of licenses do not offend constitutional guarantees of due process. Furthermore, the district court observed that the case of Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), relied on by Dr. Horwitz, was decided after the Board suspended his license and thus could not have been the basis for any clearly established constitutional rights of Dr. Horwitz which were offended by the Board's suspension. We agree.
 
 
 52
 Dr. Horwitz relies strongly on Barry v. Barchi for the proposition that he was entitled to due process safeguards prior to the summary suspension of his license. The Barry court, while recognizing that the horse trainer's license issued by the New York Racing Board was such a property interest as to invoke due process protections, nevertheless held that the state's interest in assuring the integrity of racing entitled the state to impose an interim suspension without a presuspension hearing:
 
 
 53
 Unquestionably, the magnitude of a trainer's interest in avoiding suspension is substantial; but the state also has an important interest in assuring the integrity of the racing carried on under its auspices. In these circumstances, it seems to us that the state is entitled to impose an interim suspension, pending a prompt judicial or administrative hearing that would definitely determine the issues, whenever it has satisfactorily established probable cause to believe that a horse has been drugged and that a trainer has been at least negligent in connection with the drugging.
 
 
 54
 443 U.S. at 64, 99 S.Ct. at 2649.
 
 
 55
 It is true that the Barry decision does note, in passing, that:
 
 
 56
 Furthermore, although Barchi was not given a formal hearing prior to the suspension of his license, he was immediately notified of the alleged drugging, 16 days elapsed prior to the imposition of the suspension, and he was given more than one opportunity to present his side of the story to the state's investigators.
 
 
 57
 443 U.S. at 65, 99 S.Ct. at 2649.
 
 
 58
 The Barry v. Barchi Court, in our view, placed far more emphasis on the state's interest in preserving the integrity of the sport of racing and in protecting the public interest, than it did upon Barchi's presuspension due process rights:
 
 
 59
 Even if the state's pre-suspension procedures, then, were not adequate finally to resolve the issues fairly and accurately, they sufficed for the purposes of probable cause and interim suspension.
 
 
 60
 443 U.S. at 66, 99 S.Ct. at 2650.
 
 
 61
 We recognize that a close reading of Barry v. Barchi does disclose that the licensee was given some opportunity to respond prior to the summary suspension order. That aspect of the case does not shine through as a clear due process requirement, however. It was cited in Loudermill as follows:
 
 
 62
 See also Barry v. Barchi, 443 U.S. 55, 65, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979) (no due process violation where horse trainer whose license was suspended "was given more than one opportunity to present his side of the story").
 
 
 63
 470 U.S. at 542, 105 S.Ct. at 1493.
 
 
 64
 The Colorado Supreme Court heard Colorado State Board of Med. Examiners, etc. v. D.C. of 7th J. Dist. en banc. It was a unanimous opinion. The court fully considered various United State Supreme Court decisions relied on by Dr. Horwitz here dealing with due process requirements in relation to his contention that he was entitled to some form of hearing prior to suspension of his license. The court held that no presuspension notice or hearing is required when the Medical Board finds that an emergency exists and "[t]here is adequate support for the Board's conclusion that an emergency exists." 551 P.2d at 196.
 
 
 65
 None of the cases cited by Dr. Horwitz deal with suspensions of licenses of medical practitioners under "emergency" determinations of the governing board. Thus, we agree with the district court's conclusion that at the date of Dr. Horwitz's license suspension, there was no clearly established constitutional law requiring that Dr. Horwitz be accorded some "opportunity to present his side of the story." What is clear from this record is that under the command of Barry v. Barchi, supra, and like decisions, Dr. Horwitz was accorded prompt and full post-suspension due process. Following the summary suspension of his license on December 21, 1983, a formal complaint was filed on January 4, 1984, and following a response, etc., a formal hearing was commenced on January 19, 1984. The matter was expeditiously handled through to the hearing panel's final order of May 1, 1984.
 
 
 66
 WE AFFIRM.