**Thomas P. MOORE, M.D., Plaintiff,**

v.

**GUNNISON VALLEY HOSPITAL, Robert P. Austin, Brian K. Moloney, M.D., Gloria Beim, M.D., Ronald A. Long, M.D., Jay McMurren, M.D., and Jay Wolkov, D.O., Defendants.**

**No. 99–WM–990.**

United States District Court,
D. Colorado.

Oct. 22, 2001.

Daniel R. Satriana, Jr., Steven M. Gutierrez, Hall & Evans, L.L.C.

David Baumgarten, Gunnison County Attorney, Gunnison.

Donald T. Trinen, Hart & Trinen, L.L.P., Denver.

## AMENDED ORDER ON MOTION TO DISMISS [1]

MILLER, District Judge.

The plaintiff brings this civil rights lawsuit pursuant to 42 U.S.C. § 1983 alleging that the Gunnison Valley Hospital (Hospital) and the individual defendants, all members of the medical staff or officers of the Hospital, violated his rights to due process by summarily suspending his Hospital privileges and then issuing two admonitions against him. The individual defen-

---

1. The amendments to my September 28, 2001 order are technical only and do not affect the substance of my ruling.

dants have moved to dismiss the claims against them on the bases of absolute and qualified immunities.

## Standard of Review

A Rule 12(b)(6) motion to dismiss is appropriate where it appears beyond doubt that the plaintiff could prove no set of facts entitling him to relief. *Jojola v. Chavez*, 55 F.3d 488, 490 (10th Cir.1995). I must accept as true all well pleaded facts and construe all reasonable allegations in the light most favorable to the plaintiff. *United States v. Colorado Supreme Court*, 87 F.3d 1161, 1164 (10th Cir.1996).

## Background

Accepting the well-pleaded allegations of the amended complaint as true, plaintiff was a licensed, practicing physician with staff privileges at the Hospital. On March 21, 1998, those privileges were summarily suspended by the president of the Hospital, defendant Robert Austin (Austin), and the chief of the Hospital's medical staff, defendant Bryan Moloney, M.D. (Moloney). Complaint, ¶ 9. According to Article IX.B.1 of the Hospital's Bylaws, Rules of Regulations of the Medical Staff (Bylaws),[2] Austin, Moloney, an Executive Committee of the Hospital's Board of Trustees (Board), or the Board itself may summarily suspend a person's staff membership or privileges whenever the person's "conduct requires that immediate action be taken to protect the life of any patient(s) or to reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient, employee or other person present in the Hospital  ...." Plaintiff's suspension apparently followed a recommendation by an *ad hoc* committee appointed by defendants Austin and Moloney and consisting of Moloney and two other defendants, Gloria Beim, M.D. and Ronald A. Long, M.D. (Long). Complaint, ¶ 9.[3]

The supposed factual basis for the summary suspension was plaintiff's alleged incompetent treatment of a particular patient at a *different* hospital. (Plaintiff had no patient at the Hospital when the suspension issued.) Complaint, ¶ 11.

The complaint states that the individual defendants did not make a reasonable investigation of the facts prior to suspension and failed to give plaintiff any notice or opportunity to be heard, either before or after the suspension. *Id.*

Pursuant to Article VIII.B.2 of the Bylaws, the medical staff, upon review, terminated plaintiff's suspension on March 26, 1998, apparently without the necessity of plaintiff exercising his procedural rights under the Bylaws.[4] Complaint, ¶ 14.

**2.** These Bylaws were mentioned in the complaint but were not attached as an exhibit. Defendants tendered them as Exhibit A to their motion to dismiss without objection from the plaintiff. Reference to this exhibit in these circumstances does not convert the motion into a motion for summary judgment pursuant to Fed.R.Civ.P. 12(b). Rather, the exhibit is considered a part of the pleading pursuant to Fed.R.Civ.P. 10(c) for purposes of a motion to dismiss. *See GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir.1997).

**3.** The role of this *ad hoc* committee in the suspension is unclear. Paragraph 9 of the

Complaint states that the president and chief of staff suspended plaintiff but then suggests it was the committee that suspended plaintiff (suspension "procured by Austin and Moloney through and by means of" the committee). Article IX of the Bylaws does not grant any *ad hoc* committee of the medical staff the authority to summarily suspend anyone. Accordingly, I assume this committee's role was to investigate and recommend, not decide, the issue.

**4.** Article IX.B.3. of the Bylaws provides that "unless the medical staff immediately terminates the suspension and ceases all further corrective action," plaintiff would be entitled

Nevertheless, nine months later, defendants Austin and Moloney, acting through another *ad hoc* committee,[5] this time composed of defendants J. McMurren, M.D., Jay Wolkov, D.O. and Long, "procured and effected the issuance of two admonitions" of plaintiff for the same conduct that gave rise to the suspension. Complaint, ¶ 16. Again, plaintiff was provided no notice or opportunity to be heard. *Id.* In contrast to a summary suspension, however, the Bylaws specifically declare that a letter of admonition "shall not entitle a staff member to a hearing or appellate review." Bylaws, Art. X.1.A.

Plaintiff has demanded that the admonitions be vacated or, if not, that he be given a hearing on the admonitions. Defendants have refused both demands. Complaint, ¶ 19.

Plaintiff seeks damages against the individual defendants as well as the issuance of a mandatory injunction against the Hospital requiring, alternatively, the vacation of the summary suspension and admonitions *ab initio* or a fair hearing on those issues. The individual defendants seek dismissal, asserting absolute, quasi-judicial immunity or, minimally, qualified immunity.

## Discussion

### I. Absolute Immunity

Defendants assert that, given the alleged judicial nature of their roles under the Bylaws, they are entitled to absolute immunity from § 1983 liability. *See Pierson v. Ray*, 386 U.S. 547, 553–555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Absolute immunity for judges (and others) has been deemed necessary to assure that those involved in the judicial process "can perform their respective functions without harassment or intimidation" by the parties to the dispute. *Butz v. Economou*, 438 U.S. 478, 512, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). Although significant, the loss of the right to seek private redress for unconstitutional conduct is countered in this instance by the nature of the judicial process. *Id.* Given the protections built into the judicial process, the risk of an unconstitutional act by a judicial officer "is clearly outweighed by the importance of preserving the independent judgment of such people." *Id.* at 514, 98 S.Ct. 2894. In considering safeguards against improper acts, the Supreme Court stated:

> The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process and the correctability of error on appeal are just a few of the many checks on malicious action by judges. Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of cross examination and the penalty of perjury.

*Id.* at 512, 98 S.Ct. 2894.

■ Judicial immunity is not limited to appointed or elected judges but includes those performing roles "functionally comparable" to judges, such as hearing examiners and administrative law judges. *Id.*

---

to procedural rights contained in Article X of the Bylaws, including full hearing rights. *See* Art. X, Part 3 of the Bylaws.

**5.** As compared to a summary suspension, the Bylaws contemplate a procedure for appointing an *ad hoc* committee of medical staff members to investigate any need for "routine corrective action" and report to the medical staff. Bylaws, Art. IX.A.3. Staff is then authorized to take action, including "issuing ... a letter of admonition." Art. IX.A.3.(b).

The Tenth Circuit has extended absolute immunity to the Colorado Board of Medical Examiners, *Horwitz v. State Bd. of Medical Examiners,* 822 F.2d 1508, 1514–15 (10th Cir.1987); parole boards, *Russ v. Uppah,* 972 F.2d 300, 303 (10th Cir.1992); county administrative review boards, *Atiya v. Salt Lake County,* 988 F.2d 1013, 1017 (10th Cir.1993); and municipal hearing officers, *Saavedra v. City of Albuquerque,* 73 F.3d 1525, 1529 (10th Cir.1996).

Although defendants focus on their alleged quasi-judicial status, absolute immunity has been extended to essential participants in the judicial process such as the prosecutor and witnesses. In particular, absolute immunity of the prosecutor in his or her advocacy role has been established since *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). The *Imbler* court relied on the observations of Judge Learned Hand that the lack of civil redress for improper actions of a prosecutor is the price for vigorous advocacy:

> As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.

*Id.* at 428, 96 S.Ct. 984 (quoting *Gregoire v. Biddle,* 177 F.2d 579, 581 (2nd Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950)).

▮ Absolute immunity does not, however, extend to all prosecutorial functions. On the one hand, when the prosecutor is the advocate in the judicial proceeding he is protected by absolute immunity. *Burns v. Reed,* 500 U.S. 478, 490–493, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (prosecutor presenting evidence in support of motion for search warrant is absolutely immune). On the other hand, when the prosecutor performs investigative services he or she is like a police officer and entitled only to qualified immunity. *Buckley v. Fitzsimmons,* 509 U.S. 259, 273–74, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); *see also Kalina v. Fletcher,* 522 U.S. 118, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997) (prosecutor performing role of complaining witness is not immune). Therefore, to determine whether or not a prosecutor is absolutely immune depends upon the function performed and not simply his or her title. *Id.*

▮ In making the determination whether the immunity is qualified or absolute it should be remembered that "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect [most] government officials in the exercise of their duties." *Burns v. Reed,* 500 U.S. at 486–87, 111 S.Ct. 1934. "Because absolute immunity is of a 'rare and exceptional character,' *Cleavinger v. Saxner,* 474 U.S. 193, 202, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), '[it] extends no further than necessary to protect those activities' 'intimately associated' with the judicial process. Rex [v. Teeples], 753 F.2d [840]at 843 [ (10th Cir.1985) ]." *Villescas v. Richardson,* 124 F.Supp.2d 647, 654 (D.Colo.2000) (Babcock, C.J .).

▮ The essential inquiry is, therefore, whether or not the roles of the defendants were "functionally comparable" to that of a judge, prosecutor or witness entitled to absolute immunity. The *Butz* Court provides hallmarks of the judicial process against which the procedures of the defendant Hospital can be compared. The subsequent decision of *Cleavinger v. Saxner* summarized the characteristics of judicial process by listing six nonexclusive factors:

> (a) The need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the

need for private damages actions as means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) correctability of error on appeal.

474 U.S. at 202, 106 S.Ct. 496.

In *Horwitz,* a panel of the Tenth Circuit distilled the *Butz* reasoning into a three-element formula to be satisfied before absolute immunity should be allowed:

(a) the officials' functions must be similar to those involved in the judicial process, (b) the officials' actions must be likely to result in damages lawsuits by disappointed parties, and (c) there must exist sufficient safeguards in the regulatory framework to control unconstitutional conduct.

822 F.2d at 1513.

Application of this *Horwitz* formula suggests that defendants are not entitled to absolute or quasi-judicial immunity:

### A. Similarity of Functions to Those Involved in the Judicial Process

It is not clear from the complaint what roles various defendants played in the summary suspension. *See supra* note 2. Assuming that Austin as president and Moloney as chief of staff issued the summary suspension as authorized,[6] with the *ad hoc* committee performing an investigatory and recommending role, I conclude Austin and Moloney were acting in a role similar to a judge entering a temporary restraining order (without a full factual hearing or even involvement of the other side) or as a prosecutor in an advocacy

capacity, both roles suggesting entitlement to absolute immunity.

Members of the *ad hoc* committee, on the other hand, if acting as an investigative body are more functionally "comparable" to a policeman conducting an investigation and therefore are not entitled to absolute immunity. *Buckley,* 509 U.S. at 273–74, 113 S.Ct. 2606. I also note that the Bylaw provisions concerning summary suspension do not appear to contemplate the use of an *ad hoc* committee and, accordingly, its committee members may have been acting without portfolio and therefore dissimilar to a person acting within the judicial process. Likewise, if indeed the committee issued the summary suspension, the Bylaws provide no authority for such actions, and the committee could not be acting in a judicial role.[7]

### B. Likelihood of Damage Lawsuits

As this action confirms, physicians subject to adverse actions do file damage lawsuits.

### C. Sufficiency of Safeguards in the Regulatory Framework

Characteristics of the judicial process summarized in *Cleavinger* provide good measures by which to judge the adequacy of the safeguards of the Hospital's Bylaws in comparison to the built-in protections of the judicial process:[8]

#### 1. Need to assure individuals can perform function without intimidation

Absolute immunity has the merit of encouraging the participants in the review process to make objective decisions with-

---

6. The Bylaws grant the power of summary suspension only to the chief of the medical staff, the president, executive committee of the Board or the Board itself. Bylaws Art., IX.B.1.

7. *See* note 5.

8. Defendants addressed these issues in their briefs; plaintiff did not.

out the fear of retaliation or other types of intimidation. Accordingly, this consideration militates toward absolute immunity.

### 2. *Presence of safeguards to reduce need for private damage actions*

Defendants assert that the bylaws provide adequate safeguards against unconstitutional conduct.[9] Concerning possible actions adverse to the physicians, the Bylaws distinguish between "Routine Corrective Action" (IX.A.), summary suspension (IX. B.), automatic suspension for loss of license or Drug Enforcement Agency number and failure to maintain medical records (IX.C.) and, finally, failure to maintain malpractice insurance (IX.D.). Only the first two categories are pertinent here.

The first, routine corrective action, contemplates the filing of a written request for corrective action with the chief of staff who is to immediately forward the request to an *ad hoc* committee appointed by the chief of staff. Art. IX.A.2. The *ad hoc* committee has 60 days to forward a report of its investigation to the full medical staff which is then authorized to take various actions, including issuing a letter of admonition or recommending suspension or revocation of staff membership. Art. IX. A.3.(b) and (f). If the recommended suspension is contested, the hospital board ultimately decides the issue. Art. X.F.2. Depending on the circumstances, the staff member may or may not have procedural rights. *See* Art. IX.A.5. The complaint makes no mention of any required written request for corrective action, and I assume none exists. Similarly, although the com-

plaint certainly suggests the involvement of an *ad hoc* committee, there is no allegation that a written investigative report was submitted by the committee pursuant to Article IX.A.3.

Letters of admonition are an example of "routine corrective action," but the Bylaws deny the targeted staff member procedural rights in the letter of admonition process (Art. IX.A.5.), and the complaint alleges that no hearing or procedural rights were granted.

The second applicable category is summary suspension, to which the routine corrective action procedures do not appear to apply. A plain reading of the summary suspension provisions grants that authority only to the Board, Chief of Staff or president *without* the requirement of a written request pursuant to Article IX. A.2., or investigation and report by an *ad hoc* committee. Art. IX.A.3. This suggests that a staff member could be summarily suspended without any written charge or peer review. However, after summary suspension the medical staff must act within seven days to terminate or uphold the suspension. If the staff does not immediately terminate the suspension, the affected staff member is entitled to the stated procedural rights. Art. IX.B.2. and 3. The complaint states that the full staff terminated plaintiff's suspension on March 26, 1998, and no further disciplinary action was pursued. Complaint, ¶ 14.

In sum, the complaint appears to allege that the plaintiff was summarily suspended and made subject to two letters of admonition for the same acts [10] without any writ-

---

**9.** Curiously defendants use a summary suspension as an example of these safeguards stating that it is "only justified under the most exceptional circumstances." Motion to dismiss, p. 12. The case history suggests that plaintiff's suspension was not based upon such "exceptional circumstances": since the

medical staff terminated the suspension after only a few days.

**10.** I also note that proceeding with the later admonitions with no opportunity to be heard violates Article IX.B.3. which requires that plaintiff be given procedural rights if the staff

ten submission of the charges or opportunity for the plaintiff to be heard. If the defendants assert that they may so proceed to the plaintiff's detriment under the Hospital's Bylaws, serious questions arise whether the Bylaws provide adequate safeguards to justify absolute immunity from private damages actions.

### 3. Insulation from political influence

Acknowledging that their actions do not meet the standards applicable to a federal judge, defendants nevertheless argue that the Bylaws and the Colorado Medical Practices Act establish a peer review procedure "as free from political influence as possible." Motion to dismiss, p. 12. I disagree.

The *ad hoc* nature of the committee makes it less comparable to any established judiciary because there exists a risk that the appointing officer may select predisposed individuals. A chief of staff will likely be aware of staff member attitudes on practice issues and could well predetermine a result by his or her appointments. Certainly *ad hoc* appointments are less satisfactory than the use of committees created to serve for a time certain and which are already sitting when the need for review arises. For example, the Colorado Board of Medical Examiners, granted absolute immunity in *Horwitz,* 822 F.2d at 1514–15, is appointed by the governor and includes individuals with no connection to the medical profession, presumably people who do not have a potential self-interest in the outcome. Colo.Rev.Stat. Ann. § 12–36–103(1)(a) (2001). The institutionalization of a committee appointed by an independent governor is a signifi-

cant substantive difference. Here the appointing person was not independent or removed from the issues, may well have been acting without authority if, as alleged, the president appointed the committee,[11] and may have served his alleged personal bias with his *ad hoc* appointments.

The *ad hoc* committees contemplated by the Bylaws are much more subject to manipulation than the legal structure of the Colorado Board of Medical Examiners and, hence, more distant or distinguishable from an independent judiciary, whether appointed or elected.

### 4. Importance of precedent in resolving controversies

Defendants correctly observe that there is no perfect analogy to the legal system's reliance upon reported decisions as precedents but urge that peer review is an acceptable substitute. Defendants argue that judging the propriety of the plaintiff's actions against established professional practice is a similar process and helps avoid *ad hoc* decision-making unrelated to professional expectations. Although the analogy is not perfect, established standards of practice have precedential value, and this would weigh in favor of absolute immunity.

### 5. The adversarial nature of the process

Defendants argue that the discipline procedures provided in the bylaws are sufficiently adversarial, pointing out that plaintiff was successful in having the summary suspension lifted. A staff member may indeed have procedural rights similar

---

does not "cease all further corrective action" after termination of the suspension.

**11.** Article IX.A.3. authorizes only the Chief of Staff to appoint the *ad hoc* committee to make

the investigation. If proved, allowing an unauthorized individual to appoint the *ad hoc* committee would constitute improper influence.

to those provided by the adversarial system, including rights of notice, hearing, representation, and examination of witnesses, but these rights do not apply in every case.

Admonitions do not give rise to any procedural rights and, according to the complaint, plaintiff was never given the opportunity to be heard on the summary suspension or letters of admonition. Thus, in this case, the advocate of sanctions was not restrained by exposure to cross-examination or countervailing evidence. Further, the decision-makers were not screened like jurors to minimize bias. Consequently, many of the safeguards of the adversary system were lacking, weakening the justification for absolute immunity. *See Butz,* 438 U.S. at 512, 98 S.Ct. 2894.

### 6. *Correctability of error on appeal*

There are appellate rights to the Board which may ultimately correct improper acts by the staff. Art. X, parts 5 and 6. However, adverse actions against staff are treated as presumptively valid and, hence, difficult to reverse. As to certain staff privileges, the affected staff member must show, "by clear and convincing evidence," [12] that the action "lacks any substantial factual basis or that the basis or the conclusions drawn therefrom are either arbitrary, unreasonable or capricious." Bylaws, Art. X.3.G.

The parties seem to agree that the Board's final actions may also be subject to *certiorari* review pursuant to Colo. R. Civ. P. 106(a)(4). These procedures, however, may not afford an adequate remedy to provide an aggrieved physician redress for

losses otherwise recoverable under a section 1983 damage action.[13]

Applying these factors to plaintiff's allegations suggests that the defendants' peer review process lacks sufficient functional safeguards common in the judicial process to protect against the infringement of rights.

I test this conclusion by comparing the circumstances of this case with cases in the Tenth Circuit that have recognized absolute immunity. As discussed above, the *Horwitz* decision granting judicial immunity to the Board of Medical Examiners is distinguishable because of the way the Board members are appointed, including the appointment of independent Board members who are not physicians and the appointment for a set term as opposed to the *ad hoc* process used by defendants.

The granting of absolute immunity to parole board members is in similar circumstances. *See Knoll v. Webster,* 838 F.2d 450 (10th Cir.1988). In Colorado, members of the parole board are appointed by the Governor and serve a set term. *See* Colo.Rev.Stat. Ann. § 17–2–201 (2001).

In *Atiya v. Salt Lake County,* 988 F.2d 1013 (10th Cir.1993), the Circuit concluded that the role of a County Career Services Council was "functionally comparable" to that of a judge and that the individual Council members were protected by absolute immunity. The Council consisted of appointed officials who heard appeals concerning employee suspensions, demotions, dismissals or other grievances. It issued written decisions that were subject to an unabridged right of appeal to the district courts of Utah. *Id.* at 1017. Again, an

---

**12.** Other privileges require proof by preponderance of the evidence that the decision lacks any basis or is arbitrary, etc.

**13.** *Certiorari* review pursuant to Rule 106(a)(4) is limited to determining whether the governmental body exercising *quasi*-judicial function exceeded its jurisdiction or abused its discretion.

established hearing body comprised of individuals serving set terms is distinguishable from the *ad hoc* committee or committees appointed in this case whose rulings are subject only to limited rights of appeal.

Likewise, appointed hearing officers who pass muster for absolute immunity are distinguishable. In *Saavedra v. City of Albuquerque*, the district court made findings which the Court of Appeals concluded justified absolute judicial immunity:

> The hearing before the [hearing officer] is adversary in nature. Employees have the right to counsel and the opportunity to present evidence, provide testimony, and cross examine witnesses. The [hearing officer] is a professional hearing officer, is not considered an employee of the City, and is sufficiently independent. His decisions are insulated from political pressure. The [hearing officer] makes written findings of fact and issues a recommendation....

73 F.3d at 1530. In contrast, the summary suspension and admonitions here were not adversarial, as plaintiff did not have the right to counsel or the opportunity to be heard. The decision-makers were not established hearing officers and may not have been sufficiently independent.

Finally, defendants rely heavily on Fourth and Eighth Circuit authorities holding that certain physicians' peer review committees were entitled to absolute immunity. Plaintiff argues that the cases are distinguishable.

In *Kwoun v. Southeast Missouri Prof'l Standards Review Org.*, 811 F.2d 401 (8th Cir.1987), the issue was whether regional and statewide peer review committees recommending to the Health Care Financing Administration (HCFA) that the plaintiff be excluded from eligibility for Medicare payments should be entitled to absolute rather than qualified immunity. The court held that the committees were in the na-

ture of investigators or even prosecutors, concluding that absolute immunity was essential for the conduct of this public business in accordance with the *Butz* decision. The court noted that these committees made recommendations to HCFA for final determination and that administrative and judicial review operated as a check against abuse. *Kwoun*, 811 F.2d at 409. Plaintiff argues that *Kwoun* is distinguishable because the committees were subject to direct and immediate oversight by a federal agency. Although oversight may provide some further protection, more important are the institutionalization of the peer review process, full adversarial rights and less restricted rights of appeal, all markedly different from this case.

In *Ostrzenski v. Seigel*, 177 F.3d 245 (4th Cir.1999), the court concluded that a physician assigned the task of investigating the plaintiff's practice and making recommendations to the Maryland Board of Physician Quality Assurance concerning sanctions was entitled to absolute immunity for performing prosecutorial functions within the *quasi*-judicial process. The Board itself, like that in Colorado, enjoyed *quasi*-judicial immunity, and the court determined that the peer reviewer duties "were analogous to those of a prosecutor reviewing the evidence to determine whether to recommend prosecution." *Id.* at 250. *Ostrzenski* is distinguishable not only because the Board itself was an ongoing institution but also because it could not take action without giving the affected physician notice and an opportunity for hearing with full due process rights. In addition, contrary to the circumstances here, grounds for any adverse action had to be proven "by clear and convincing evidence." *Id.* at 251.

In conclusion, remembering that the public interest of protection of individuals involved in these public responsibilities can

be achieved in most instances by qualified rather than absolute immunity, the presumption favors a finding of qualified immunity. *Burns,* 500 U.S. at 486–87, 111 S.Ct. 1934. Absolute immunity should be of "rare and exceptional character." *Cleavinger,* 474 U.S. at 202, 106 S.Ct. 496. Given the circumstances presented here— particularly the threat of influence and limited procedural and appeal rights—I conclude that defendants should not be entitled to absolute immunity. They have not overcome the presumption or met their burden of justifying its use. *Burns,* 500 U.S. at 486, 111 S.Ct. 1934.

## II. *Qualified Immunity*

■ Qualified immunity is provided to "government officials performing discretionary functions ... insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

> When qualified immunity is raised in a Fed.R.Civ.P. 12(b)(6) motion, the plaintiff must carry the burden of establishing that the defendant violated clearly established law. Thus, the plaintiff must identify a clearly established statutory or constitutional right of which a reasonable person would have known, and then allege facts to show that the defendant's conduct violated that right.

*Lybrook v. Members of Farmington Mun. Sch. Bd. Of Educ.,* 232 F.3d 1334, 1337 (10th Cir.2000) (internal quotations and citations omitted).

■ Therefore, in evaluating this motion to dismiss, one would normally employ a two-step process to determine "whether the allegations in the complaint establish the violation of a constitutional right, and if so, whether that right was clearly established." *Benefield v. McDowall,* 241 F.3d 1267, 1270 (10th Cir.2001). In this case, however, the defendants concede that the plaintiff's hospital privileges are protected by due process and must therefore be afforded sufficient protection from government intrusion. Defs.' Reply Br., p. 8 (stating that "[t]he issue is not whether Plaintiff's hospital privileges are protected by due process, but whether Plaintiff has alleged sufficient particularized facts demonstrating any of the individual Defendants actually violated any [of] his constitutional rights"; "[n]owhere in the Defendants' Motion to Dismiss did the Defendants argue that Plaintiff's public hospital privileges were not a protected property interest triggering due process requirements"). I conclude that this concession includes an acknowledgment that these constitutional rights were clearly established at the time of the alleged invasions. *See, e.g., Horwitz,* 822 F.2d 1508 (suggesting that at least since 1987 privileges to practice medicine at public hospitals in Colorado are property rights subject to due process protections and that suspension of those privileges is justified if only an emergency in fact exists).

■ Accordingly, the defendants have limited the issue presented to whether the plaintiff has adequately pleaded due process violations that survive qualified immunity. Defendants' singular argument is that plaintiff failed to meet a heightened pleading standard that defendants claim is necessary to overcome the defense of qualified immunity.[14] The Tenth Circuit, however, has now explicitly rejected that re-

---

**14.** "[T]he entire thrust of the Defendants' qualified immunity arguments concerns the utter lack of specific, concrete, and non-conclusory factual allegations in the Plaintiff's Complaint demonstrating any of the individual Defendants actually violated Plaintiff's due process constitutional rights." Defendants' reply brief, p. 8.

quirement. *See, e.g., Currier v. Doran,* 242 F.3d 905, 916–17 (10th Cir.2001) (plaintiff need not plead "specific, nonconclusory factual allegations" to survive a motion to dismiss). The defendants' remedy when faced with conclusory allegations in a complaint is to file a motion for a more definite statement pursuant to Fed.R.Civ.P. 12(e) rather than seeking dismissal of the complaint. *Id.* at 915. I will not put the plaintiff to the burden, proposed by the defendants, of providing "specific, concrete, and non-conclusory factual allegations" in response to the defendants' motion to dismiss, and, instead, I will review the complaint in the light most favorable to the plaintiff to test its sufficiency. *See, e.g., Benefield,* 241 F.3d at 1270 (stating that the proper test for a motion to dismiss is whether the allegations, construed in the light most favorable to the plaintiff, establish the violation of a clearly established constitutional right).

Here, the plaintiff alleges that both peer review groups and the administrators reached decisions without factual support, without notice, and without the opportunity for a hearing—either before or after the alleged deprivations. In fact, according to the complaint, the plaintiff had no patients under the care of the Hospital at the time of his suspension. Thus, there was no factual basis to support an emergency suspension designed to protect patients at the Hospital. In addition, with respect to motive, the complaint, taken as true, suggests that the plaintiff's due process rights were knowingly and wantonly violated by the peer review groups under political pressure from the hospital president and the chief of medical staff and not for any legitimate professional reasons. Thus, I find that the plaintiff's complaint is sufficient, in light of the defendants' concessions, to survive a motion to dismiss with respect to qualified immunity.

Accordingly, it is ordered that the defendants' motion to dismiss, filed on July 12, 1999, is denied.