B STREET COMMONS, INC., a Colorado corporation, and Just Buddies, Inc., a Colorado corporation, d/b/a Blue Moon Saloon, and Daniel Sobieray, Plaintiffs,

and

Vince Harrington, Gregory Dowell, and Penny Clark, Intervening Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS OF EL PASO COUNTY, and Gary Shupp, Marcy Morrison, Charles H. Meier, Loren H. Whittemore, Jim Campbell, the County Commissioners, in their individual and official capacities, Defendants.

Civ. A. No. 87–M–1679.

United States District Court, D. Colorado.

May 27, 1993.

Michael W. Gross, Arthur M. Schwartz, Denver, CO, for plaintiffs.

Kenton H. Kuhlman, Kuhlman and Kuhlman, P.C., Englewood, CO, for intervening plaintiffs.

Beth Whittier, Patrick A. Wheeler, Alam W. Samber, El Paso County Atty., Colorado Springs, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

In this action under 42 U.S.C. § 1983 the defendants' moved for summary judgment on the plaintiffs' damages claims, and the plaintiffs and intervenors filed a cross motion for partial summary judgment on the issue of qualified immunity. The plaintiffs are B Street Commons, Inc. (a Colorado corporation), Just Buddies, Inc. (a Colorado corporation d/b/a the Blue Moon Saloon), and Daniel Sobieray. The intervening plaintiffs are Vince Harrington, Gregory Dowell, and Penny Clark. These parties are collectively called plaintiffs. The defendants are the Board of County Commissioners of El Paso County (the Board), Gary Shupp, Marcy Morrison, Charles Meier, Loren Whittemore, and Jim Campbell (the commissioners) in their individual and official capacities. Jurisdiction exists pursuant to 28 U.S.C. § 1343(a)(3).

El Paso County regulated adult entertainment businesses under Resolution 86–83, Land Use 36 ("the Resolution"), enacted by the Board on March 27, 1986. The definition of "adult uses" included adult bookstores, adult hotels, and adult movie theaters. On November 4, 1987 John Muse and Daniel Sobieray, then owner-operators of the Blue Moon Saloon, filed a § 1983 action claiming that the special use permit requirement in the Resolution was facially invalid, as violative of the First and Fourteenth Amendments. (John Muse is no longer a plaintiff in this case.) Vince Harrington and Gregory Dowell's motion to intervene in this matter was granted on November 18, 1987. On January 12, 1990, this court granted plaintiffs' original motion for partial summary judgment, declaring the special use permit requirement unconstitutional on its face. On March 27, 1990 Penny Clark's motion to intervene was granted.

The commissioners denied two applications for special use permits for two locations for adult business establishments in El Paso County: one filed by Sobieray and Muse, and a second filed by Dowell and Harrington. Both denials occurred before the Resolution was declared unconstitutional. The plaintiffs were involved in business plans concerning two properties in El Paso County—one at 2145 B Street, Colorado Springs, and the second at 3675 South Highway 85/87. They claim that denial of a special use permit destroyed their plans. In a consolidated amended complaint, filed April 16, 1990, Daniel Sobieray and the two corporations claimed damages for loss of a sale of the B Street property to Clark; expenses for improve-

ment of the property and to make the sale; loss of a development loan for two adjacent lots; loss of leases on the adjacent lots; holding costs; out-of-pocket expenses incurred in seeking the special use permit; lost business opportunities; and losses incurred in the foreclosure of the B Street property. Harrington and Dowell claimed as damages: out-of-pocket expenses in seeking the special use permit; loss of a lease option for the South Highway property resulting in a lost business opportunity to establish an adult business; and expenses to improve the property. Intervenor Clark seeks damages for: loss of income and profits; loss of business opportunity and future income; construction and remodelling expenses; prepaid expenses of rent and security deposits; and additional costs of doing business, e.g., salaries, tax, and insurance. All plaintiffs seek attorneys fees, costs, and legal expenses.

From the papers filed with the motions, these facts appear to be uncontested:

### History of the B Street Property

March 27, 1986—the Resolution was enacted by the Board of County Commissioners.

July 15, 1986—Muse and Sobieray bought the property located at 2145 B Street in Colorado Springs, taking title as tenants in common. They intended to divide this property into three parcels, and construct new buildings on two of the parcels.

September 25, 1986—B Street Commons, Inc. and Just Buddies, Inc. were incorporated. Muse and Sobieray were named as officers and directors of both corporations. Sobieray was the president of both. Just Buddies took the trade name Blue Moon Saloon.

March 6, 1987—Muse and Sobieray submitted their application for special use permit for the B Street premises to the El Paso County Planning Commission.

April 20, 1987—El Paso County Land Use Department received a letter from Philip Anderson, as attorney for Muse and Sobieray, requesting a 30-day delay on the adult use application because his clients had signed a sales contract for the B Street property with a potential buyer not interested in the adult use.

May 3, 1987—Muse quitclaimed his interest in the B Street property to Sun Hwang and Duck Gibson.

June 2, 1987—Muse transferred his stock in Just Buddies, Inc. and B Street Commons, Inc. to Hwang and Gibson, and resigned as an officer and director of both corporations.

June 19, 1987—Penny Clark executed a contract with B Street Commons, Inc. to purchase the B Street property for $450,-000. The contract included an addendum for a lease and option to acquire the business of the Blue Moon Saloon. The contract was signed by Sobieray as President of B Street Commons, Inc., Hwang, and Gibson as sellers, and Clark as buyer. The record title ownership of the real property at this time is not clear.

The addendum also provided for the transfer of 1,000 shares of stock in Just Buddies, Inc. to Clark to allow her to apply for a liquor license transfer. Also, the addendum stated that the lease contract would be terminated after 18 months if Clark did *not* receive the adult use permit for a topless nightclub.

July 6, 1987—Clark executed a lease with option to buy with B Street Commons, Inc. for the B Street property. The lease terms authorized Clark to use the leased premises for an adult tavern/nightclub. The signers were Sobieray as president of B Street Commons, Inc. and Clark.

July 13, 1987—Clark executed a management agreement with Just Buddies, Inc. with respect to the Blue Moon Saloon. The signers were Sobieray as president of Just Buddies, Inc., and Penny Clark. Clark also executed a bill of sale for 1,000 shares of stock in Just Buddies from B Street Commons. The stock was to be held in escrow. Sobieray signed the contract as president of B Street Commons, Inc.

July 14, 1987—The board of directors of Just Buddies, Inc. (directors present listed in minutes as Sobieray, Hwang, and Gibson) approved the sale of the corporation,

with all 1,000 shares of stock to be held in escrow pending approval of the local liquor licensing authority. The board also approved the management agreement for Clark to operate the Blue Moon Saloon until approval of the liquor license.

The board canceled the nomination of Hwang and Gibson as directors, and resolved that the election of new officers and directors would be delayed until the corporation received approval from the liquor authority.

July 27, 1987—Sobieray learns (via a letter from the El Paso Planning Department to his attorney, Anderson) that his special use application for an adult use permit for the B Street property is on indefinite hold status.

July 30, 1987—Sobieray, Hwang, and Gibson quitclaimed their interests in the B Street property to B Street Commons, Inc.

August 28, 1987—Anderson's letter advised the Land Use Department that the new purchasers of the Blue Moon Saloon wished to pursue the adult use application previously submitted by Muse and Sobieray. The request was that the matter be scheduled for the appropriate public hearings and noted that, although the process should proceed under the names of Muse and Sobieray, the ownership was subject to change in the near future.

September 15, 1987—the special use application by Muse and Sobieray was heard and approved by the El Paso County Planning Commission.

October 16, 1987—After the liquor license transfer contemplated in the June 19, 1987 contract failed because Sobieray did not make timely transfer, the parties decided to proceed with the transaction. Thus, Clark executed a second management agreement with Just Buddies, Inc. with respect to the Blue Moon Saloon. The signers were Sobieray as president of Just Buddies, Inc. and Clark.

Also, B Street Commons, Inc. executed a lease with option to buy contract with Just Buddies, Inc. for the B Street property. The contract provided that Just Buddies could use the leased premises solely for the purpose of a tavern nightclub. The contract was signed by Sobieray as president of B Street Commons, and Clark as president of Just Buddies.

November 4, 1987—Muse and Sobieray, d/b/a Blue Moon Saloon, filed this action.

November 5, 1987—The Board denied the Muse and Sobieray application for a special use permit. The board of Just Buddies, Inc. canceled the sale of the corporation to Clark. The corporation was restructured to its position on June 2, 1987, the officers and directors being Sobieray, Hwang, and Gibson.

December 9, 1987—Sobieray resigned as an officer and director of Just Buddies, Inc. and assigned his stock to Hwang and Gibson.

August 26, 1988—A contract was executed between Just Buddies, Inc. and Kenneth Dresner to sell to Dresner all 1,000 shares of stock in Just Buddies, Inc., including the assumption of the leasehold interest of the lease between B Street Commons, Inc. and Just Buddies, Inc., dated September 1, 1988.

September 1, 1988—A management agreement was executed between Just Buddies, Inc. and Dresner, Dowell, and Harrington to operate the Blue Moon Saloon. Dresner, Dowell, and Harrington allowed nude dancing in this liquor-licensed establishment. Consequently, the State of Colorado denied the tavern license renewal application of Just Buddies, Inc.

March 1, 1989—Sobieray and Hwang resigned as officers and directors of B Street Commons, Inc. and assigned their 500 and 250 shares of the stock to Wendy Sobieray and Gibson, respectively.

January 12, 1990—This court declared the Resolution unconstitutional on its face.

September 14, 1990—A contract was executed between B Street Commons, Inc. and Concentric Ltd. to sell the real and personal property, including the trade name "Blue Moon Saloon," for $400,000.

*History of the South Highway Property*

March 27, 1986—the Resolution is enacted by the Board of County Commissioners.

July 31, 1987—George Reese, Vincent Harrington, and Gregory Dowell submitted to the El Paso County Planning Commission an application for a special use permit for property located at 3675 South Highway 85/87 for the stated purpose of establishing a non-alcoholic adult entertainment nightclub. The property was owned by Reese. Harrington and Dowell held themselves out to be lease-option holders with respect to one unit, but they had no written lease.

October 22, 1987—The Board denied the application for a special use permit filed by Harrington and Dowell.

November 4, 1987—Muse and Sobieray, d/b/a Blue Moon Saloon, filed this action.

January 15, 1988—a receiver of this property was appointed by the El Paso County District Court on the application of Otero Savings and Loan Association, the legal holder of the note and deed of trust burdening the property.

February 9, 1988—Otero Savings bought the property at a foreclosure sale.

January 12, 1990—This court declared the Resolution unconstitutional on its face.

The moving party bears the initial burden of showing that there is an absence of any issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). "[W]hen a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), quoting F.R.C.P. 56(c). After the moving party meets this burden, the non-moving party then must come forward with specific facts showing that there is a triable issue as to elements essential to the non-moving party's case. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir. 1991). Using these standards, the court finds and concludes that, as a matter of law, the individual commissioners have both absolute and qualified immunity; and that the plaintiffs have not met their burden to come forward with sufficient facts to support their damages claims.

**I. Immunity for the Individual Commissioners:** The Supreme Court has held that absolute legislative immunity for federal and state law-making bodies extends to regional legislators. *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 405, 99 S.Ct. 1171, 1179, 59 L.Ed.2d 401 (1979). It is now well-established that *Lake Country Estates* also provides absolute immunity to *local* legislators acting in a legislative capacity. *Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 577 n. 22, 579 (9th Cir.1984). What was ruled constitutionally invalid in this case is the legislation itself, the Resolution; and for its enactment, the commissioners acted in a legislative capacity. The commissioners' votes on the permit applications were made pursuant to the Resolution. *Cf. Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (Supreme Court classified the denial of a request for rezoning a parcel of property as a legislative act). Since the permit process is an integral part of this Resolution, and legislative immunity also covers the application determinations, the individual defendants Morrison, Meier, Whittemore, Campbell, and Shupp have absolute immunity for their actions of denying the applications for special use permits.

These individual commissioners are also absolutely immune on a second ground: for quasi-judicial acts. Absolute judicial immunity has been extended to *local* officials when they act in a quasi-judicial capacity. *Reed v. Village of Shorewood,* 704 F.2d 943, 952 (7th Cir.1983) (local liquor control commissioner is acting in a judicial capacity, and thus absolutely immune, when deciding on renewal and revocation of liquor licenses). The Supreme Court in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), held that an administrative law judge is "functionally comparable" to a judge; here the commissioners' denial was an *adjudication* of individual factors being considered

under the Resolution. The Tenth Circuit expanded *Butz* in *Horwitz v. Board of Medical Examiners of Colorado*, 822 F.2d 1508, 1513 (10th Cir.1987), to encompass absolute immunity for official functions that are parallel to those involved in the judicial process. Similarly, the Colorado Supreme Court, in *Cherry Hills Resort Development Co. v. City of Cherry Hills Village*, 757 P.2d 622, 627 (Colo.1988), stressed that the central focus is "on the nature of the governmental decision and the process by which that decision is reached." In *Colo. State Bd. of Land Commissioners v. Colo. Mined Land Reclamation Bd.*, 809 P.2d 974, 981–82 (Colo.1991), the court concluded that zoning decisions have a dual nature, as legislative and quasi-judicial. Here the commissioners acted in a quasi-judicial capacity in reviewing the permit applications of Sobieray, Harrington, and Dowell and thus are absolutely immune.

■■■ The individual defendants are also entitled to qualified immunity. Officials performing discretionary functions in conjunction with their governmental duties are immune under § 1983 if their actions did not violate clearly established statutory or constitutional rights about which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The basic test is "whether the legal norms allegedly violated by the [defendants] were clearly established at the time of the challenged actions...." *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1984). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right"; that is, the unlawfulness of the action must be clear in the context of *pre-existing* law. *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Rozek v. Topolnicki*, 865 F.2d 1154, 1157 (10th Cir.1989). It is the plaintiff who has the burden of proving that the law was "clearly established" at the time of the alleged violation, and also the burden of demonstrating *how* defendants' conduct violated that law. *Rozek* at 1157.

■■■ While it is arguably true that a reasonable county *attorney* should have known that a discretionary permit scheme such as El Paso County's was unconstitutional, in 1987 it was reasonable for county *commissioners* to believe that commercial nude dancing was *not* entitled to full first amendment protection. Constitutional law in the area of nudity, zoning, and expressive conduct has been unstable in recent years. Even Supreme Court Justices cannot concur on what the Constitution protects in this controversial area. Recently in *Barnes v. Glen Theatres*, —— U.S. ——, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), a fragmented Court used three opinions to form a five-member majority. In November 1987, the date of the permit determinations, these county commissioners could not have been expected to know that their Resolution (which included the permit application process) was *clearly* unconstitutional. In short, because the commissioners' actions did not violate clearly-established constitutional rights of which a reasonable person would have known, defendants in their personal capacities are protected by qualified immunity from a § 1983 suit. Therefore, even if absolute immunity did not shield the individual defendants, qualified immunity would.

Based on the conclusions above, only El Paso County itself remains as a defendant. The County's liability is limited to that deriving from an unconstitutional policy decision. Thus the County is liable for provable damages.

■■■ **II. Actual Damages and Causality:** A plaintiff must show actual injury *caused* by the defendant to recover more than nominal damages. *Taxpayers for the Animas–La Plata Referendum v. Animas–La Plata Water Conservancy District*, 739 F.2d 1472, 1479–81 (10th Cir.1984). It is the defendants' contention, however, that according to the briefs and affidavits submitted, the clear inference that emerges from a muddied pool of transactions is that any damages suffered by the two corporations or by Sobieray, Dowell, Harrington, and Clark were *not* due to the County's acts. Instead, these plaintiffs and intervening plaintiffs, through a series of ill-considered business decisions, caused their own damages. Defendants contend that property title gaps, unorthodox corporate practices, technical contractual

flaws, liquor license problems, and tax considerations all attenuate any economic effects from these permit denials. The defendants' analysis of plaintiffs' papers, summarized in the following paragraphs, shows a confusing series of transactions and arrangements which do not reveal damages caused by denials of the two special use permit applications. The plaintiffs have not answered the many questions presented and have not, therefore, made a sufficient showing of damages to warrant submission to a jury.

On May 13, 1987, Muse quitclaimed his interest in the B Street property, so that on this date the real property was owned by Sobieray, Hwang, and Gibson. On June 2, 1987, Muse transferred his stock and resigned as an officer and director of both corporations. On June 19, 1987, Ms. Clark executed a contract with B Street Commons, Inc., to buy the B Street property for $450,000. This contract was, in part, a lease with an option to buy the Blue Moon Saloon, including the building, land, furnishings, fixtures, equipment, liquor license, and business. A contract addendum stated that the lease could be terminated after 18 months *if* Clark did not receive the adult use permit for a topless nightclub; thus Clark's business deal was *conditioned* on the permit, which undermines her argument for start-up costs. Actually, Sobieray speaks of the enterprise as having "three contingencies," one being the adult use permit, thus any one of them could have soured the deal. Sobieray Affidavit at ¶ 19. In addition, argue defendants, this contract was invalid because B Street Commons, Inc. did not *own* the real property, including the building—until July 30, 1987. This is the date when Sobieray, Hwang, and Gibson quitclaimed their interests in the property to B Street Commons. Finally, B Street Commons did *not* have the legal power to sell the Blue Moon Saloon's trade name, liquor license, and business because at that time it was *owned* by Just Buddies.

On July 13, 1987, continue defendants, Clark executed a management agreement with Just Buddies, Inc. such that she would be the day-to-day manager for the Blue Moon Saloon, with the control of the business remaining with Just Buddies. The contract signers were Clark, and Sobieray as president of Just Buddies. On the same date, 1,000 shares of stock in Just Buddies were transferred from B Street Commons to Clark. However, the bill of sale was signed by Sobieray as president of B Street Commons, and yet B Street Commons had no power to sell the stock of Just Buddies, which it did not own. On July 14, 1987, the board of Just Buddies approved the sale of the corporation—with all 1,000 shares held in escrow pending a liquor license—but the president of Just Buddies, Inc., never signed the contract on behalf of the corporation. As of July 27, 1987, the real property at B Street was owned by Sobieray, Hwang, and Gibson, individually; and the Blue Moon Saloon was owned by Just Buddies. Further, since the board of Just Buddies did not approve the nomination of Hwang and Gibson as officers and directors, Sobieray was the sole director of Just Buddies, Inc., though a minimum of two directors was legally required, note defendants.

Clark, on October 16, 1987, executed a second agreement with Just Buddies, Inc., for her to manage the Blue Moon Saloon, echoing the previous arrangement. Again the signers were *Sobieray as president of Just Buddies,* and Clark. Also on October 16, B Street Commons executed a lease with option to buy contract with Just Buddies for the B Street property, providing that the premises were to be used for the purpose of a tavern/nightclub. The signers were Sobieray as president of B Street Commons, and *Clark as president of Just Buddies.* But if Clark were president of Just Buddies on October 16, 1987, defendants ask, why did she need a management agreement to operate the Blue Moon Saloon, then owned by Just Buddies, and why did *Sobieray* sign the agreement as president of Just Buddies? Worse, this lease agreement did *not* permit the use of the premises as an adult club: the agreement disallowed any practices which might be a nuisance to other B Street Commons tenants, including a variance in the agreed use—for example, the viewing of any adult-only film, photo, or printed matter. The commissioners denied the special permit on November 5, 1987, and on December 7,

the board of Just Buddies canceled the sale to Clark.

Moving to the next set of transactions, the defendants observe that on August 26, 1988, Kenneth Dresner and Just Buddies contracted to sell Dresner all 1,000 shares in Just Buddies, including the assumption of a leasehold interest of the lease between B Street Commons and Just Buddies (dated September 1, 1988). Also on September 1, Dresner, Dowell, Harrington, and Just Buddies, Inc. executed a management agreement to operate the Blue Moon Saloon. After they allowed nude dancing in that liquor-licensed club, however, the State of Colorado denied the tavern license renewal application of Just Buddies. On September 14, 1990, B Street Commons, Inc. and Concentric Ltd. contracted to sell the real and personal property at B Street, including the trade name Blue Moon Saloon, for $400,000. While this selling price is $50,000 less than Clark's price, plaintiffs cannot rationally trace this loss to the adult use permit denial, defendants note. Ironically, this loss resulted from *their* violation of the state liquor laws. Once again, B Street Commons, Inc., contracted to sell the assets of a corporation which it apparently did not own.

For similar reasons, argue the defendants, any damages sustained by Harrington and Dowell regarding the South Highway property cannot fairly be traced to the County's actions. On July 31, 1987, Harrington, Dowell, and George Reese (owner of the South Highway property) submitted an application to the commission for a special use permit for this premises, for the stated purpose of opening a non-alcoholic adult nightclub. Harrington and Dowell represented themselves as lease-option holders with respect to unit c in building 2, but they had no written lease agreement. On January 15, 1988, the property went into receivership; and neither the legal holder of the note, Otero Savings & Loan, nor the receiver (Mr. Veitch) wanted an adult use permit; and neither contemplated leasing any part of this property to Harrington and Dowell for an adult entertainment business. Apparently, this was a multiple-use property. Therefore, Harrington and Dowell have shown no injury *as a result of* the denial of the adult use permit for this property, maintains the County, because even had the proposed club opened in August, 1988, it would have closed a few months later when the property went into receivership. They would most probably have lost their investment because of their failure to have a written lease agreement, *and* the disinterest of the receiver and new owner for an adult use on the premises, the defendants conclude.

Large damage amounts are claimed by plaintiffs for lost start-up costs. Colorado law permits recovery for an approximation of the *amount* of damages if *the fact* of damage is certain. *Western Conference Resorts, Inc. v. Pease*, 668 P.2d 973, 977 (Colo.App.1983); CJI–Civ.3d 5:5. Here, however, the *basis* for damages is remote and speculative. Plaintiffs never refute—with specifics—the defendants' allegations of ineffective contracts and transfers. They merely assert that their consistent "plan," their overarching "intention" was always to operate adult entertainment establishments, and that the commissioners' conduct prevented this. The plaintiffs maintain that any debatable issues of contract validity or parties' intent are jury questions, thus precluding summary judgment. This simply misstates the law. Vague plans, desires, and intentions are not sufficient to survive defendants' summary judgment motion. Plaintiffs submitted no *fixed* and detailed business plan immediately dependent on an adult use license: for the only establishment feasible under these circumstances—a soft-drink-only nude dancing club. It is not this court's mission to trace chains of title, and strings of causality; rather, that is the plaintiffs' responsibility which they have not met.

Closely related to the issue of *actual* damages is the simple standing test from *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), which is parallel to this dispute. From *Warth*, a town zoning ordinance case, the criterion for standing is that the permit denial have a *personal* effect on the applicant. There, no plaintiff had a *present* interest; none had even been denied a permit; thus none was subject to the ordinance when the case ripened. In *Warth*, the

applicants had expressed a *desire* to buy in the restricted area of the town, but there was no evidence that they could afford homes there, and no indication that they had bought and yet could not *use* the property. Thus there was no remedy possible. The same conclusion applies here.

The relevant documents of this record do not show that the County's actions were the direct cause of any injury. Since the plaintiffs have failed to make an adequate showing of the fact of damages caused by the permit denials, nominal damages only will be awarded.

Upon the foregoing, it is

ORDERED that the plaintiffs' and intervening plaintiffs' cross motion for summary judgment on qualified immunity is DENIED. It is

FURTHER ORDERED that the individual defendants' motion for summary judgment of dismissal is GRANTED; the County's motion for summary judgment on the plaintiffs' claims for actual damages is GRANTED; and the Clerk shall enter judgment for the plaintiffs against the County in the amount of $1.00 with costs to be awarded on the filing of a bill of costs within 10 days.